**In re GRAND JURY MATTER.**

**Appeal of UNITED STATES of America.**

**No. 81–1402.**

United States Court of Appeals,
Third Circuit.

Argued Oct. 29, 1981.

Decided March 9, 1982.

---

Peter F. Vaira, U.S. Atty., Walter S. Batty, Jr., Donald A. Purdy, Jr. (argued), Asst. U. S. Attys., Philadelphia, Pa., for appellant.

Gilbert J. Scutti, Philadelphia, Pa., for appellee.

Before ADAMS, ROSENN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

The United States appeals from an order of the United States District Court for the Eastern District of Pennsylvania denying the Government's motion to compel the testimony of a witness [1] before a grand jury. The witness has asserted the privilege against adverse spousal testimony,[2] claiming that any testimony by her directed to the activity of a third party would indirectly implicate her husband, who the United States has conceded is a target of the same investigation. We agree with the district court that the witness is entitled to assert the privilege and we therefore affirm its order.[3]

### I.

Following her plea of guilty to one count of conspiracy to possess with intent to distribute and to distribute methamphetamine, a non-narcotic controlled substance, and one count of aiding and abetting the distribution of methamphetamine, the witness was subpoenaed to testify before a grand jury investigating the drug operation in which she had participated. She was immunized under 18 U.S.C. § 6002 (1976),[4] but exer-

---

1. Because the record in this case has been ordered sealed, we will not disclose the names of the interested parties. *See generally* 3d Cir. R. 21(3)(a).

2. The privilege against adverse spousal testimony, which protects the right of one spouse not to testify against the other, is to be distinguished from the privilege which protects private marital communications. Both are sometimes referred to as the "marital privilege."

3. Although Judge Sloviter disagrees, the author of this opinion believes that the district court

may have the power to insulate the witness' husband from the effect of her testimony without forcing the Government to forego her testimony about the activity of the third party. *See* note 12 *infra.*

4. 18 U.S.C. §§ 6001–05 (1976), enacted as § 201(a) of Title II of the Organized Crime Control Act of 1970, Pub.L.No. 91–452, 84 Stat. 927 (1970), authorizes a United States Attorney to grant use and derivative use immunity to an individual who refuses to testify before a court or grand jury proceeding on the basis of the privilege against self-incrimination. The per-

cised her privilege against adverse spousal testimony before the grand jury. The Government then moved to compel her testimony and in support of the motion filed an affidavit with the district court certifying that nothing said by the witness before the grand jury would be used, *"either directly or indirectly, against her husband in any legal proceedings."* (Emphasis added.) In effect, the Government appeared to promise the witness that it would confer upon her husband immunity coextensive with the statutory use and derivative use immunity conferred on the witness, as a way of respecting the witness' privilege against adverse spousal testimony while pursuing other members of the drug operation.[5]

In a subsequent affidavit, however, the Government retreated from its initial offer of a broad grant of immunity protecting the husband. The affidavit provides:

> [T]he government will not present to the Grand Jury empaneled January 28, 1981 an indictment in which [witness'] spouse ... is named as a defendant or as an unindicted co-conspirator. By this procedure, the government intends to effectively prevent the possibility that the Grand Jury empaneled on January 28, 1981 will consider [witness'] testimony in deciding whether to indict her spouse....

To respect the wife's privilege against adverse spousal testimony, the Government ultimately promised only to refrain from naming the witness' husband in an indictment presented to this particular grand jury. The Government confirmed at a hearing before the district court that her husband was indeed a target of its investigation. Moreover, the Government conced-

ed that if the wife's testimony implicated a third party, and that person was willing to testify against the husband, then a separate grand jury would be empaneled from which the United States would seek the husband's indictment.

Under her claim of privilege the witness refused to answer a series of questions concerning the involvement of the third party and others in the drug operation. Based on the Government's representations at the hearing, the district court upheld the claim of marital privilege and denied the Government's motion to compel her testimony. In holding that the *indirect* use contemplated by the Government of the witness' testimony would violate the privilege, the district court relied on this court's analysis in *In re Grand Jury (Malfitano)*, 633 F.2d 276 (3d Cir. 1980); it distinguished *In re Snoonian*, 502 F.2d 110 (1st Cir. 1974), relied on by the Government. In *Snoonian*, the court permitted government attorneys to file affidavits promising not to prosecute the nontestifying spouse as a way of accommodating a claim of the privilege against adverse spousal testimony. The court held that "the speculative nature of the threat to [the nontestifying spouse], coupled with the Government's unequivocal and convincing promises not to use any of the testimony against her," *id.* at 113, nullified any claim of privilege as grounds for the witness' refusal to testify. *Id.*[6] In *Malfitano*, in contrast, this court refused to find that the Government's promise not to use one spouse's testimony against the other vitiated the privilege, since the nontestifying spouse was a target of the grand jury before which the spouse was called to testify. 633 F.2d at 279–80.[7]

---

son so immunized may then be compelled to testify since the compelled testimony cannot be used directly or indirectly against the witness in any criminal proceeding. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

**5.** Such a procedure was first used in *In re Snoonian*, 502 F.2d 110 (1st Cir. 1974). *See* note 6 and accompanying text *infra*.

**6.** In *Snoonian*, a husband testifying before a grand jury investigating extortionate extensions of credit attempted to assert the privilege on the ground that his testimony would subject his wife, because they had executed a joint tax return, to liability for tax fraud. 502 F.2d at 112.

**7.** The spouse whose testimony was sought worked as secretary for five corporations in which her husband was president. The corporations, the husband, and others were charged

In the case at bar, the district court concluded that *Malfitano* controlled.

The only difference that exists in the present case from the *Malfitano* decision is that the testimony of the wife here will not directly implicate her husband before the same grand jury before which she is testifying. Rather, it will indirectly implicate her husband in a future legal proceeding. As such, the effect is the same; the danger to the marital relationship is as manifest.

*In re Grand Jury*, No. 80–121–4, slip op. at 6–7 (E.D.Pa. Feb. 13, 1981). The court also concluded that the Government was attempting to renege on its initial sworn promise not to use the witness' testimony, "either directly or indirectly, against her husband . . . in any legal proceedings."

## II.

### A.

If, as Wigmore points out, "the fear of causing marital dissension or disturbing the domestic peace" were the genuine fundament of the privilege, then the privilege should apply to any perjorative testimony toward the other spouse. 8 J. Wigmore, Evidence § 2234, at 230–31 (McNaughton rev. 1961). But this broad application of the privilege was rejected at common law and its scope confined to only such testimony as is adverse to the other spouse's legal interests in the very case under consideration. *In re Snoonian, supra*, 502 F.2d at 112; J. Wigmore, Evidence, *supra*, § 2234, at 231. Despite this restriction, the privilege against adverse spousal testimony has in modern times been subject to considerable criticism,[8] and the empirical basis of the privilege has been seriously called into question.[9] Nonetheless, the privilege remains

an important obstacle to the admission of certain testimony in federal court. Rule 501 of the Federal Rules of Evidence provides in relevant part: "the privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." In *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), the Supreme Court recently redefined the scope of the privilege against adverse spousal testimony in federal court. The Court modified the rule of *Hawkins v. United States*, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958), which had permitted a *nonwitness* spouse to invoke the privilege to prevent the witness spouse from testifying against him, and held that the privilege ran only to the witness spouse. 445 U.S. at 53, 100 S.Ct. at 914. Thus one spouse may now voluntarily testify against the other. The Court refused, however, to further limit the privilege, as had been suggested by the Conference on United States Laws and others, to one protecting only confidential communications. *Id.* at 48–50. The Court examined the modern justification for the privilege, *viz.* "its perceived role in fostering the harmony and sanctity of the marriage relationship," *id.* at 44, and concluded that it had continuing vitality. *Id.* at 53.

This court had occasion to review the import of the *Trammel* decision in *In re Grand Jury (Malfitano)*, 633 F.2d 276 (3d Cir. 1980). We concluded that in *Trammel* the Supreme Court had "decided that the privilege against adverse spousal testimony remains a viable principle of federal law and only modified the privilege by vesting it solely in the testifying spouse." *Id.* at 277. As we then noted, "The crux of [the]

---

with conspiracy to secure a loan from the Teamsters Union Pension Fund by paying a kickback in violation of 18 U.S.C. §§ 1341, 1343, 1954, 371 and 1962. 633 F.2d at 276–77. None of the parties disputed the probability that the wife's testimony would implicate her husband. *Id.* at 277.

**8.** *See, e.g.*, C. McCormick, *Handbook of the Law of Evidence* § 66 (2d ed. 1969); 8 J. Wigmore, *Evidence* § 2228 (McNaughton rev.

1961); Hutchins & Slesinger, *Some Observations on the Law of Evidence: Family Relations*, 13 Minn.L.Rev. 675 (1929); Reutlinger, *Policy, Privacy, and Prerogatives: A Critical Examination of the Proposed Federal Rules of Evidence as They Affect Marital Privilege*, 61 Calif.L.Rev. 1353 (1973).

**9.** *See* Rosenberg, *The New Looks in Law*, 52 Marq.L.Rev. 539, 541 (1969).

privilege is that a person may not be forced to be a witness against his or her spouse in a criminal proceeding." *Id.*

In *Malfitano* we held the privilege applicable to spousal testimony before a grand jury where both husband and wife were alleged to have participated in the crime under investigation. We first rejected the notion that because both spouses were under criminal investigation they were not deserving of the protection against potential marital discord which the privilege affords.

> The fact that the grand jury will consider appellant's testimony and possibly indict her husband on the basis of it will put a strain on their marriage. The husband will be subjected to an indictment based in part on appellant's testimony. This is no less of a strain on the marriage than if the appellant testified at his trial.

633 F.2d at 280 (footnote omitted). The argument that the Government's promise never to use the witness spouse's testimony abrogated the need to invoke the privilege was also found unpersuasive. We observed that there was no way of preventing the grand jury from considering the witness spouse's testimony in deciding whether to indict the nonwitness spouse. *Id.* at 279. By implication we suggested that if the

Government "sever[ed] the husband's indictment from that of the other defendants to ensure that the grand jury does not use appellant's testimony against her husband," *id.*, the privilege might thereby be respected. It is the question of the adequacy of this latter procedural safeguard which is now posed to this court.

### B.

■ In the present appeal, we must decide whether the testimony which the Government is eliciting from the witness amounts to testimony "against ... her spouse in a criminal proceeding." *In re Grand Jury (Malfitano), supra*, 633 F.2d at 277. We hold that when, as in the present case, the Government openly seeks one spouse's testimony concerning the activity of a third party, who is alleged to have engaged in a common criminal scheme with a husband and his wife, and the Government thereby hopes also to reach the nonwitness spouse, the testimony sought is sufficiently adverse to the interests of the absent spouse to permit invocation of the privilege against adverse spousal testimony. As in *Malfitano*, the wife's testimony is sought with the understanding that it is likely to implicate her husband.[10] The sole

---

**10.** In *Malfitano*, the Government wanted to ask the witness questions about telephone records of the five corporations in which her husband was president, 633 F.2d at 277; *see* note 7 *supra*, and about a meeting presumably attended by the witness and a number of others, 633 F.2d at 277. The Government conceded that it assumed that her answers would implicate her husband in the illegal kickback scheme under investigation. *Id.*

> Although in this case the witness has not been asked questions about her husband's involvement in the drug operation, as a colloquy before the district court reveals, the Government, despite its representations to the contrary, hopes to use her testimony in order to get to her husband.
>
> THE COURT: I don't know. Is he [the husband] a target; do you know, Mr. Purdy, at this time?
> MR. PURDY: I would say yes, Your Honor ....
> THE COURT: Then I will sustain Mr. Scutti's position. What do you want her testimony for?

MR. PURDY: Against [third party], Your Honor. We want to present an indictment which is already drafted to the grand jury impanelled January 28, 1981, naming [third party] in that conspiracy that [the witness spouse] pleaded guilty to.
THE COURT: What if the target surfaces in some other grand jury testimony offered by you in this testimony against him?
MR. PURDY: Your Honor, we have presented the affidavit saying we will not use what she says or use the fruits of what she says against her husband in any proceeding. We are following the dictates of the Third Circuit in Malfitano and their reliance on Snoonian. We have met the requirements, we submit, and we do not have to say that he will not be a target.

&ast; &ast; &ast; &ast; &ast; &ast;

THE COURT: Let me ask one thing, Mr. Purdy: Is [the husband's] status as a target in any way connected or affiliated with [fourth party] or [fifth party] or [third party]?
MR. SCUTTI: Sir, it is the same investigation.

&ast; &ast; &ast; &ast; &ast; &ast;

difference between the decisions is that here the Government seeks to accomplish indirectly what in *Malfitano* we prohibited it from doing directly. The potential disruption to marital harmony is in no sense diminished because the impact of the spouse's testimony is delayed. Therefore, if the integrity of the privilege is to be maintained, a wife who asserts the privilege should not be compelled to testify before a grand jury when her spouse is a target of the same underlying investigation as the party against whom she is called to testify and her testimony is sought with the expectation that it may lead to his indictment by a subsequent grand jury.

In *Malfitano*, we suggested that the Government might have avoided the effect of the privilege by severing the husband's indictment from that of the other defendants "to ensure that the grand jury does not use appellant's testimony against her husband." 633 F.2d at 279. We now conclude

> MR. PURDY: But in the event that [third party] would cooperate and we could obtain [third party's] testimony against [the husband], which we submit is legitimate, given that we had his name before we had any information about tapes or spouses or whatever, and if you listen—if I may make—
> THE COURT: Just go on, yes. Then, you would—?
> MR. PURDY: Then we would hope to use [third party's] and [fifth party's] testimony against—
> THE COURT: —[The husband?]
> MR. PURDY: —[The husband.]
>      *     *     *     *     *     *

Transcript of Hearing before Hon. Louis C. Bechtle, February 11, 1981, at 71–74, *quoted in In re Grand Jury*, No. 80–121–4, slip op. at 2–4 (E.D.Pa. Feb. 13, 1981).

11. The dissent argues that our decision represents an unjustifiable expansion of *Trammel*. We disagree for several reasons. First, although *Trammel* traced the antipathy with which the privilege has been treated by commentators, the court nonetheless "declined to abandon completely the privilege...." *Dissenting opinion, at* 697. Second, in *Malfitano* this court plainly indicated that the privilege against adverse spousal testimony remains a forceful one in this circuit. Third, we note that we take as guidance for the scope of our authority in this case Fed.R.Evid. 501, which directs us to apply the exception "in the light of reason and experience." We believe that our decision properly executes that directive.

that having the Government simply forswear bringing an indictment against the nonwitness spouse before the *same* grand jury before which the witness spouse testifies does not adequately "protect the spouse from the effect of the testimony." 633 F.2d at 280 n.6.[11] To permit the Government to effectuate its promise, made under the constraint of our decision in *Malfitano*, that nothing said by the witness spouse will be used, either directly or indirectly, against her husband, by the mere expedient of not indicting the nonwitness spouse before the same grand jury "transforms that sworn promise into a worthless opinion." *In re Grand Jury*, No. 80–121–4, slip op. at 7 (E.D.Pa. Feb. 13, 1981).

The continued recognition of the privilege against adverse spousal testimony is not without its costs. It may result in probative evidence of guilt being withheld from the grand jury or at trial. If the testimony

We also must disagree with the dissent's attempt to distinguish this case on the ground that the link between the wife's testimony and her husband's future indictment is too speculative and therefore does not threaten to "'tear asunder' the marital union." *Dissenting opinion, at* 698. Although we agree that in certain circumstances the link between one spouse's testimony and its potential adverse impact on the other spouse may be too attenuated to warrant invocation of the privilege, we do not believe this to be such a case. As noted above, all who are party to the action understand that the wife's testimony is sought, inter alia, in the hope that her husband will be indicted. Her testimony is, thus, in our opinion, sufficiently adverse to her husband's interests for her to be able to invoke the privilege.

Finally, we do not believe that the simple expedient of bringing the husband's indictment before a separate grand jury adequately respects the privilege. Although, as the dissent points out, the privilege could not be invoked at common law when the testimony was "not used in the proceeding in which the non-witness spouse [was] a party," *dissenting opinion, at* 698, we do not believe that the Government should be permitted to bootstrap into two proceedings a prosecution based on a single common scheme for the sole purpose of circumventing the privilege. It would be anomalous to permit the Government to do indirectly what it is forbidden to do directly.

of a witness spouse who invokes the privilege is the only evidence of guilt against the other spouse, the latter cannot be convicted. Thus, the possibility that a criminal may not be convicted for the commission of a crime because of the privilege is the price which the judicial system accepts in order to further the societal goal of preserving marital harmony. But this feature of the privilege was carefully considered by the Court in *Trammel* and this court in *Malfitano*.

Accordingly, the order of the district court will be affirmed.[12]

12. The author of this opinion is somewhat troubled with our categorical enforcement of the privilege against adverse spousal testimony, which thereby protects a third party who has no entitlement whatsoever to the benefits of the privilege. I believe that the district court can respect the witness' privilege against adverse spousal testimony without also interfering with the Government's attempted prosecution of the third party, about whose activity the wife is being asked to testify. Writing in concurrence in *Malfitano*, Judge Gibbons recognized that the district court has the inherent authority to confer use-fruits immunity on the witness' spouse. *In re Grand Jury (Malfitano)*, supra, 633 F.2d at 281. In other words, the court has the power to order that neither the witness' testimony, nor the fruits thereof, can be used in any subsequent prosecution against her husband. Once the wife's testimony is immunized, the Government bears the burden in any subsequent prosecution of establishing that the evidence it proposes to use against the husband is derived from a legitimate source wholly independent of his wife's testimony. *See generally Kastigar v. United States*, 406 U.S. 441, 460, 92 S.Ct. 1653, 1664, 32 L.Ed.2d 212 (1972) (discussing the scope of use-fruits immunity, also referred to as use and derivative use immunity, under 18 U.S.C. § 6002). The wife's testimony can then be compelled without abrogating the privilege. *Cf. United States v. Doe*, 478 F.2d 194, 195 (1st Cir. 1973) (where both spouses are granted immunity they can no longer invoke the privilege against adverse spousal testimony).

This court has already recognized that the district court has the inherent power to grant use-fruits immunity to a witness for the purpose of obtaining testimony favorable to the defense which is otherwise unavailable because the witness has invoked the privilege against self-incrimination. *In re Grand Jury (Malfitano)*, supra, 633 F.2d at 281; *see Government of the Virgin Islands v. Smith*, 615 F.2d 964, 970–74 (3d Cir. 1980); *United States v. Herman*, 509 F.2d 1191, 1204 (3d Cir. 1978), *cert. denied*, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979). The district court should therefore have no less inherent power to confer use-fruits immunity to permit testimony otherwise unavailable by virtue of the assertion of the privilege against adverse spousal testimony. 633 F.2d at 281 (Gibbons, J., concurring). *Smith* and *Herman* recognized that a federal court has the inherent authority to fashion "a new remedy to protect an established right." *Government of the Virgin Islands v. Smith*, 615 F.2d at 971; *see United States v. Herman*, 509 F.2d at 1204. Devising a mechanism to protect the privilege against adverse spousal testimony, with its roots in the common law, is particularly suited to judicial action. Moreover, court conferred immunity based on the privilege against adverse spousal testimony does not run afoul of the basic problem raised by *Smith* of judicial usurpation of the prosecutorial decision whether to grant immunity to one person in order to obtain evidence against another. Although the immunity fashioned here is judicially created, it is the Government which ultimately can decide whether the risk of immunizing the husband from prosecution outweighs its desire to obtain evidence from the wife against the third party. The district court would decide whether a certain line of questioning will produce answers sufficiently adverse to the nonwitness spouse to justify application of the privilege. If the court concludes that the testimony is entitled to the protection of the privilege, the Government would then decide whether, and to what extent, to question the witness spouse. Thus, the important due process considerations which were necessary to justify intervention in the prosecutorial function in *Smith* need not be present to justify judicial action here.

The district court should therefore have the authority to hold a hearing to determine whether or not a claim of the privilege is *bona fide*. If, as in this case, the Government concedes that the nonwitness spouse is a target of the investigation, or if the witness otherwise meets the burden of establishing that the other spouse may be adversely implicated by the required testimony, the district court can indicate to the prosecution that if it desires the witness' testimony, then the court will confer on the nonwitness spouse use-fruits immunity and thereby protect that spouse from the testimony of the family counterpart. Of course, any subsequent indictment of the nonwitness spouse must be brought, under *Malfitano*, before a separate grand jury.

Although the concurrence objects to the inclusion of the foregoing observations as advisory, the law is to the contrary. An advisory opinion is a gratuitous expression of legal opinion by a court lacking either jurisdiction or a justiciable controversy before it. *See* Weinstein, *Rendering Advisory Opinions—Do We, Should We?*, 54 Judicature 140 (1970), *reprinted in* R. Leflar, Appellate Judicial Opinions 63

SLOVITER, Circuit Judge, concurring in all except footnote 12.

I concur in all of Judge Rosenn's opinion except for footnote 12. I write separately only because of the inclusion of that footnote.

I believe the issue of court awarded use-fruits immunity should not be reached in this case because no party requested the district court to award such immunity, nor did either party in its appellate brief or argument address the issue of whether the district court has such power or whether its use would be appropriate in the circumstances before us.[1] Indeed, as Judge Rosenn points out in his opinion, the government retreated in the trial court from its apparent willingness to promise use-fruits immunity, and promised only not to use the wife's testimony directly against the husband. At 690. The government continues to adhere to this position on appeal. The only issue considered by the district court and the parties was the scope of the marital privilege.

In this posture of the case, I believe any suggestion that the district court might have inherent power to award use-fruits immunity to override the marital privilege is akin to an advisory opinion, and suffers from the objections which have been recognized as attending advisory opinions. *See, e.g., United States v. Fruehauf*, 365 U.S. 146, 157, 81 S.Ct. 547, 553, 5 L.Ed.2d 476 (1961). Also, neither the government nor

the counsel for the witness have been heard on the practical problems which the court's assumption of such power might present. Thus, I see no good reason to reach to address a difficult legal issue in a vacuum, particularly when the conclusion is, at least for me, far from clear.

The legal difficulties with the course which Judge Rosenn suggests are formidable. Congress has provided for a grant of immunity when a witness invokes his or her privilege against compulsory self-incrimination. 18 U.S.C. §§ 6001–05. It has made no comparable provision when a witness invokes one of the other testimonial privileges protected under Federal Rule of Evidence 501. We do not know whether the omission was deliberate. It might be possible to argue that some of the common law privileges protected by that Rule are designed to protect against disclosure itself rather than use. Many of the common law privileges, such as the doctor-patient, attorney-client, and priest-penitant privileges, are designed to protect the relationship from the mistrust and lack of candor which might follow were disclosure of confidential communications compelled. *See Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980). If so, use-fruits immunity would not adequately substitute for the compulsion of disclosure. One could debate whether the marital privilege stands in the same class as the above-mentioned privileges. In *United States v. Doe*, 478 F.2d 194 (1st Cir. 1973) the court

(1974). To avoid being merely advisory, a court's judgment must resolve " 'a real and substantial controversy admitting of specific relief through a decree of a conclusive character, *as distinguished from an opinion advising what the law would be on a hypothetical state of facts.*' " *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975) (emphasis added) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971)).

I make three observations. First, this note expresses a personal comment only, as does the concurrence, and is not a judgment of the court. Second, the footnote is not an abstract statement, cut off from a live controversy, of what the law should be. We are confronted with just such a controversy and must resolve a difficult question concerning the proper scope

of the privilege against adverse spousal testimony. Finally, the issue of whether the scope of the privilege should be coextensive with use and derivative use immunity, thus requiring a *Kastigar*-type hearing before evidence against the husband can be introduced in any subsequent prosecution of him, was raised by the Government in its brief to us.

1. The only reference at all by the government in its appellate brief to any hearing is in its suggestion that "the factual questions regarding the applicability of the marital privilege" could be decided at a *Kastigar* hearing at which the court could determine if the information used to indict the non-witness spouse was tainted. Government Brief at 15. This is on its face not the issue referred to in the text above, or in Judge Rosenn's footnote 12.

held that the government's agreement not to prosecute the non-witness spouse satisfied the purpose of the privilege, but in that case the government itself granted transactional immunity and the court merely ordered the witness spouse to testify. In *In re Snoonian*, 502 F.2d 110 (1st Cir. 1974), the government had agreed to provide use-fruits immunity to the spouse and had also advised the court that the non-witness spouse was not a target, causing the court to denominate the threat to the spouse as "speculative". The situation here is not analogous, since the government has conceded that the husband is in fact a target.

Since the government is unwilling to grant either transactional immunity or the lesser use-fruits immunity in this case, I am concerned that Judge Rosenn's suggestion may be construed as an invitation for the courts to intrude into an area which should be more appropriately left to prosecutorial discretion. A decision as to whom to immunize in order to elicit testimony inculpatory of another has traditionally been considered part of the prosecutorial, not judicial, function.

I share Judge Adams' view that the decisions of this court in *Government of the Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980), and *United States v. Herman*, 589 F.2d 1191 (3d Cir. 1978), *cert. denied*, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979), where we affirmed the inherent power of the court to immunize a witness whose testimony is essential to an effective defense, stemmed from the need to protect the due process rights of a defendant. No comparable right is suggested in this case or in this situation. Instead this case merely illustrates the dilemma which the prosecutor often faces in selecting which defendant to prosecute when, for reasons of public policy, certain testimony is shielded by a privilege.

I do not suggest that a court has no inherent power to grant immunity in appropriate circumstances, nor am I willing at this time to hold that it does. It is possible that it would be more appropriate to wait for Congress to decide that the same strong public interest which impelled it to provide for statutory immunity when testimony is needed of a witness who claims the Fifth Amendment privilege warrants a similar statute when a witness claims marital privilege. There may be compelling arguments which would persuade us that it is appropriate for the court to act even in the absence of such a statute. If so, they can await resolution until the appropriate case.

ADAMS, Circuit Judge, dissenting.

The majority today holds that the marital privilege may be invoked to foreclose testimony by a grand jury witness against a third-party who might implicate the witness's spouse before another grand jury which has not as yet been authorized. Because I believe that such a holding unduly extends the marital privilege and contravenes the dictates of the Supreme Court's recent decision in *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), I respectfully dissent.

I.

As Professor Wigmore noted, the origin of the privilege against adverse spousal testimony is shrouded in "tantalizing obscurity." 8 J. Wigmore, Evidence § 2227, at 211 (McNaughton rev. 1961).[1] Emerging late in the sixteenth century, the privilege is linked historically—if not logically—to the now universally rejected rule of spousal incompetency, which disqualified one spouse from testifying on behalf of the other. Both rules have been attributed, at least in part, to the "semimedieval metaphysic[al]" notion that the partners to a marriage are not distinct individuals but a unified whole— "duae animae in carne una" ("two souls in one flesh"). 2 J. Wigmore, Evidence § 601, at 857 (Chadbourn rev. 1979) (quoting E.

---

1. For additional discussion of the history of the privilege, see, *e.g.*, Haney, *The Evoluntionary Development of Marital Privileges in Federal Criminal Trials*, 6 Nat'l J. Crim. Def. 99 (1980); Comment, *The Spousal Testimonial Privilege After Trammel v. United States*, 58 Den.L.J. 357 (1981); Note, 11 Seton Hall L.Rev. 265 (1980).

Coke, Commentarie Upon Littleton, 6b (1628)). Thus, because the defendant was incompetent as a witness, his spouse was similarly precluded from testifying for or against him.

Moreover, maintenance of the fundamental unity of the married couple demanded legal solicitude for domestic harmony, "the peace of families":

> [W]hen the common law says that a man and his wife are one, or, in Lord Coke's language: "As two souls in one person"— it is said no man shall put asunder those who are thus joined together, and, least of all, in the name of law, shall the administration of justice pull and tear asunder this conjugal relation by the step of the sheriff or the precept of the judge that compels one to come and betray the other.

8 J. Wigmore, *supra* § 2228, at 215 (quoting Abbott, 2 *The Trial of Henry Ward Beecher* [*Tilton v. Beecher*, City Ct. of Brooklyn, N.Y.] 49–50 (1875)).

Early American jurisprudence embraced without question the "general rule that neither a husband nor wife can be a witness for or against the other." *Stein v. Bowman*, 38 U.S. 184, 195, 13 Pet. 209, 221, 10 L.Ed. 129 (1839). Subsequent rulings, however, have modified considerably the scope of the marital privilege. By the middle of the nineteenth century, the spousal incompetency rule was abolished or restricted by most states and replaced with a statutory privilege protecting confidential communications between the spouses. 8 J. Wigmore, *supra* § 2333, at 645. Years later, the United States Supreme Court followed suit, holding that the wife of a criminal defendant was a competent witness in his behalf, *Funk v. United States*, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369 (1933), but that confidential communications between husband and wife were privileged, *Wolfle v. United States*, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934).

In 1958, the Supreme Court, pointing to the "persistent instincts of several centuries," upheld the rule that permitted a defendant to exclude the adverse testimony of his spouse. *Hawkins v. United States*, 358 U.S. 74, 79, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958). But in 1980, "reason and experience" convinced the Supreme Court to overrule *Hawkins*. *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). The Court acknowledged the criticism to which the marital privilege had been subjected,[2] and was particularly impressed by the fact that, in the years since *Hawkins*, seven states had abolished the privilege of an accused to exclude adverse spousal testimony. *Trammel*, 445 U.S. at 48–49, 100 S.Ct. at 911–12. Nonetheless, it declined to abandon completely the privilege against adverse spousal testimony. Instead, the Court limited the rule to protect only the right of the *witness* spouse to refuse to testify adversely against the husband or wife. The Court reasoned that if one spouse were willing voluntarily to testify against the other, little of value remained of the marital relationship. Thus, the modern justification for the rule—"fostering the harmony and sanctity of the marriage relationship"—would not be served if the defendant could prevent his otherwise willing spouse to testify against him. *Id.* 445 U.S. at 44, 100 S.Ct. at 909.

A careful reading of the Supreme Court's opinion in *Trammel* reveals the discomfort with which the privilege against adverse spousal testimony has been viewed. The Court explicitly stated that the privilege "must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Trammel*, 445 U.S. at 50, 100 S.Ct. at 912 (quoting *Elkins v. United States*, 364

---

2. Specifically, the Court pointed to Wigmore's comment that the privilege was "the merest anachronism in legal theory and an indefensible obstruction to truth in practice." *Trammel*, 445 U.S. at 45, 100 S.Ct. at 908 (quoting 8

Wigmore, *supra* § 2228, at 221). It also noted efforts by the American Bar Association, the American Law Institute, and others to abolish or restrict the rule. *Id.*

U.S. 206, 234, 80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting)). And while the Court found it unnecessary to discard the privilege altogether, the factual context of the *Trammel* case provided the Court with an opportunity to reiterate its "historical antipathy" toward the privilege and, once again, to constrict its applicability in the federal courts. *See* Haney, *supra* note 1, at 157–58. In the face of this precedent, it would appear difficult to justify any expansion in the scope of the rule. Yet, the majority has done precisely that in the present situation.

## II.

The majority would permit the invocation of the marital privilege in this case because "[t]he potential disruption to marital harmony is in no sense diminished because the impact of the spouse's testimony is delayed," At 692, and "[i]t would be anomalous to permit the Government to do indirectly what it is forbidden to do directly." At 693, n. 11. I disagree with both the factual and the legal premises of this conclusion. While indirect use of the witness spouse's testimony conceivably may cause stress in the marital relationship, there is, in my view, a qualitative difference in impact between testimony that itself causes a grand jury to indict the non-witness spouse, and testimony against a third party, who eventually *may* testify against the spouse before another grand jury. Only in the former situation does one spouse actually speak the words that condemn the other. Surely, it is this direct use of adverse testimony—not the speculative and attenuated connection between testimony and indictment that is at issue in this case—to which Wigmore referred when he spoke of the "*natural repugnance* in every fair-minded

person to compelling a wife or husband to be the means of the other's condemnation, and to compelling the culprit to the humiliation of being condemned by the words of his intimate life partner." 8 J. Wigmore, *supra* § 2228, at 217 (emphasis in original).

Put simply, the privilege against adverse spousal testimony was never meant to bar absolutely all testimony that, in some way, affected the relationship between the marital partners. Rather, the privilege—as defined and limited throughout the centuries—reflects the irreconcilable tension between the "right to every man's evidence" and society's interest in excluding adverse testimony by one spouse against the other. *Trammel*, 445 U.S. at 50–51, 100 S.Ct. at 911–12. When the risk is high that the testimony will "tear asunder" the marital union, the societal interest in domestic harmony prevails and the courts may exclude such otherwise relevant evidence. When, in contrast, the danger to the family is merely speculative, the balance favors the admission of the testimony. Only in this way can the lower courts heed the admonition of the Supreme Court in *Trammel* that the privilege "be strictly construed and accepted." 445 U.S. at 50, 100 S.Ct. at 912.

Sensitive to this balance, the courts historically have drawn fine, but necessary, distinctions in their analyses of the marital privilege. Specifically, as the majority concedes, at 691, the courts have carefully limited the applicability of the marital privilege only to adverse spousal testimony used in the very proceeding at which the non-witness spouse is indicted or tried. The privilege cannot be invoked when the testimony is elicited in another, separate proceeding and is not used in the proceeding in which the non-witness spouse is a party.[3]

---

**3.** The marital privilege thus should be distinguished from the fifth amendment privilege against self-incrimination. The latter privilege is constitutional in nature and extends to any testimony that might tend to incriminate the witness. *See Kastigar v. United States*, 406 U.S. 441, 444–45, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972); *Hoffman v. United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 818, 95 L.Ed. 682 (1951). The marital privilege, in con-

trast, "has not ordinarily been construed to allow one spouse to decline to testify merely because the testimony may incrimate [*sic*] the other." *In re Snoonian*, 502 F.2d 110, 112 (1st Cir. 1974). At least one court of appeals explicitly has held that the scope of protection afforded by the marital privilege is not coextensive with that of the fifth amendment. *In re Grand Jury Proceedings (Hermann)*, Nos. 81–

*See, e.g., United States v. Burks,* 470 F.2d 432, 435–36 & n.6 (D.C.Cir.1972) (privilege not applicable because husband's legal interests were "in no way at stake in this case"); *United States v. Fields,* 458 F.2d 1194, 1199 (3d Cir. 1972) (testimony of spouse of one defendant sought by co-defendant; proper procedure is to grant severance and then permit the witness to testify for the co-defendant), *cert. denied,* 412 U.S. 927, 93 S.Ct. 2755, 37 L.Ed.2d 154 (1973); 8 J. Wigmore, *supra* § 2234, at 231.[4]

In *Appeal of Malfitano,* 633 F.2d 276 (3d Cir. 1980), for instance, the appellant was subpoenaed to appear before a grand jury investigating the alleged illegal acts of her husband. She refused to answer, citing her marital privilege, and was held in contempt. This Court reversed. Stating that "[t]he main rationale for the privilege today is that it protects the marriage from the discord that occurs when one spouse testifies against the other," 633 F.2d at 277, we rejected the Government's contention that the rationale of the privilege would not be served when, as here, the two spouses were "partners in crime." The fact that the grand jury *before which the appellant was called* could indict the non-witness spouse was of paramount importance to the Court:

> [T]he district court seemed to think that because the government has promised not to use appellant's testimony in future proceedings against her husband, the appellant has no reason to invoke the privilege. Even if the appellant's testimony is not used in later proceedings, it seems *there is nothing to prevent this grand jury from considering the appellant's tes-*

timony in deciding whether to indict. There is no indication that the government intends to somehow sever the husband's indictment from that of the other defendants to ensure that the grand jury does not use appellant's testimony against her husband.

\*   \*   \*   \*   \*   \*

The fact that the grand jury will consider appellant's testimony and possibly indict her husband on the basis of it will put a strain on their marriage. The husband will be subjected to a trial due to an indictment based in part on appellant's testimony. This is no less of a strain on the marriage than if the appellant testified at his trial.

633 F.2d at 279–80 (footnote and citations omitted).[5]

The *Malfitano* court distinguished *In re Snoonian,* 502 F.2d 110 (1st Cir. 1974), in which "it was clear that the grand jury *before which the husband would testify* would not use his testimony to indict his spouse." *Malfitano,* 633 F.2d at 280 (emphasis added). In *Snoonian,* Gary Snoonian refused to testify before the grand jury on the basis of the marital privilege. The Government subsequently filed an affidavit stating that "no testimony of Gary Snoonian before the Grand Jury, or its fruits, will be used in any way in any proceeding against his wife." 502 F.2d at 112. The grand jury was investigating extortionate extensions of credit; the purported danger to the wife came solely because she had executed a joint tax return and because her husband's testimony might lead to a charge of fraud. The First Circuit held that the

---

5602, 81–5636, slip op. at 13834 (5th Cir., Nov. 10, 1981).

4. Wigmore pointed out the seeming illogic of this limitation, noting that "[i]f the fear of causing marital dissension or disturbing the domestic peace were genuinely the ground of the privilege ... then the privilege should apply to testimony which in any way *disparages* or disfavors the other spouse, irrespective of his being a party to the cause...." 8 J. Wigmore, *supra* § 2234, at 230–31. Wigmore nonetheless expressed no regrets that the privilege had by definition been "restricted to such testimony only as disfavors the other spouse's

legal interests in the very case in which the testimony is offered" and thus "was wholesomely kept within some sort of bounds." *Id.* (emphasis in original).

5. The majority's conclusion that the testimony in question here amounts to testimony "against ... her spouse in a criminal proceeding," At 692 (quoting *Malfitano,* 633 F.2d at 277), is somewhat perplexing. *Malfitano* clearly reflected the common law conception of the marital privilege, limiting its applicability to adverse testimony that could be heard, *and used,* by the grand jury that indicted the non-witness spouse.

marital privilege did not apply: "the speculative nature of the threat to the wife, coupled with the Government's unequivocal and convincing promises not to use any of the testimony against her, nullifies any claim of privilege...." 502 F.2d at 113.

In the present case, the Government has promised that it "will not present to the Grand Jury empaneled January 28, 1981 an indictment in which [the witness's] spouse, ... is named as a defendant or as an unindicted co-conspirator." Appendix at 32a. Thus, while the husband may be a "target" of the Government's narcotics probe, he is not a target of *this particular grand jury's* investigation. He may never be indicted, and he most certainly will not be indicted by the grand jury that heard and considered his wife's testimony. Whatever link might exist between the witness's testimony and the eventual indictment of her husband, if such comes about, is attenuated at best. Nor has there been any claim of confidential communications between the spouses. Under these circumstances, the attempt by the Court here to disregard *Malfitano* and extend the privilege beyond its traditional boundaries is both improvident and unnecessary. As succinctly stated by Wigmore, "no court ought today to lend its sanction to any expansion of the limits of this undesirable rule of privilege, and there is at least ample authority for the most rigid restriction." 8 J. Wigmore, *supra* § 2235, at 234.[6]

I would reverse the order of the district court and hold that the privilege against adverse spousal testimony does not extend to the proceeding at hand.[7]

6. *See also* McCormick's Evidence § 79, at 165 (2d ed. 1972). ("[P]rivileges ... are inept and clumsy devices to promote the policies they profess to serve, but are extremely effective as stumbling blocks to obstruct the attainment of justice. Accordingly the movement should be toward restriction, and not toward expansion, of these mechanisms for concealment of relevant facts.").

7. Because I conclude that the privilege should not apply here, I find it unnecessary to discuss the propriety of Judge Rosenn's suggestion that the district court confer use-fruits immunity on the non-witness spouse. I am constrained to

note, however, that there is considerable doubt whether the judicial branch has authority, especially in a nonconstitutional case, to order that immunity be conferred. Both *Government of the Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980) and *United States v. Herman*, 589 F.2d 1191 (3d Cir. 1978), *cert. denied*, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979), involved due process considerations not present in the case before us today. *See also United States v. Rocco*, 587 F.2d 144, 147 (3d Cir. 1978), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979).